USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 4/7/2020

ROY JOHNSON, *an individual,* and
JAMES BRESLO, *an individual,*

Plaintiffs,

v.

AGS CJ CORPORATION, *formerly known as* AMAYA AMERICAS CORPORATION,

Defendant.

No. 17-CV-7438 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs Ray Johnson and James Breslo filed this action against AGS CJ Corporation, formerly known as Amaya Americas Corporation (hereinafter "Defendant" or "Amaya") asserting a single claim for breach of contract. Now before the Court are Plaintiffs' and Defendant's cross-motions for summary judgment. For the reasons that follow, Plaintiffs' motion is denied and Defendant's motion is granted.

**FACTUAL BACKGROUND[1]**

Plaintiffs and Amaya entered into a Stock Purchase Agreement ("SPA") on June 10, 2013 pursuant to which Plaintiffs sold 100% of Diamond Game Enterprises ("Diamond Game") stock

---

[1] The following facts are undisputed unless otherwise noted, and are drawn from the parties' submissions in connection with summary judgment, including Plaintiffs' Rule 56.1 Statement, Dkt. 55 ("Pls. 56.1 Stmt."); Defendant's Rule 56.1 Statement, Dkt. 61 ("Def. 56.1 Stmt."); the exhibits attached to the Declarations of Jeff L. Todd filed in connection with Plaintiffs' motion, Dkt. 57 ("Pls. Ex.") and Plaintiffs' response to Defendant's motion, Dkt. 71 ("Pls. Response Ex"); the exhibits attached to the Declarations of Stephen L. Saxl filed in connection with Defendant's motion, Dkt. 62 ("Def. Ex."), and Defendant's response to Plaintiffs' motion, Dkt. 67 ("Def. Response Ex."); Defendant's Counterstatement to Plaintiffs' Rule 56.1 Statement, Dkt. 69 ("Def. Counterstatement"); and Plaintiffs' Counterstatement to Defendant's Rule 56.1 Statement ("Pls. Counterstatement"). Where only one party's Rule 56.1 statement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute the fact, or merely objects to inferences drawn from the fact. Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement

to Amaya in exchange for a purchase price of $25 million.  Pls. 56.1 Stmt. ¶ 2; Def. 56.1 Stmt. ¶¶ 1-2; Pls. Ex. 2; Def. Ex. G.  Diamond Game is a gaming company that manufactures, sells, and leases gaming and lottery equipment.  Pls. 56.1 Stmt. ¶ 1.  At the time, Diamond Game leased sweepstakes machines or "terminals" to the Ysleta del Sur Pueblo Tribe, also known as the Tigua Tribe of Texas (the "Tribe"), pursuant to a Sweepstakes Equipment Agreement executed in 2008 (the "2008 Lease").  *Id*. ¶ 1; Def. 56.1 Stmt. ¶ 4.  Diamond Game's lease with the Tribe produced approximately twenty percent of its annual revenue by 2013.  Def. Rule 56.1 Stmt. ¶ 13.  The 2008 lease remained in effect until January 2014, at which point Diamond Game was leasing 416 sweepstakes terminals to the Tribe.  Def. 56.1 Stmt. ¶¶ 6, 8.

Diamond Game leased sweepstakes terminals to the Tribe with both older and newer "cabinets" or "kiosks"—the part of the terminal that enclosed the electronic components.  Def 56.1 ¶¶ 10-11.  While older cabinets had a single monitor, the newer "GEM" cabinets had two monitors.  *Id*. ¶ 11.  As of January 2014, approximately 120 of the 416 terminals leased by Diamond Game to the Tribe had two-monitor GEM cabinets.  *Id*. ¶ 12.

## I.    The Texas Action and Contempt Motion

In 1999, the State of Texas initiated a lawsuit (the "Texas Action") against the Tribe, *State of Texas v. Ysleta Del Sur Pueblo, et al.,* No. EP-99-CV-320-KC (W.D. Tex. 1999), in the United States District Court for the Western District of Texas (the "Texas Court") alleging that the Tribe was engaged in illegal gambling operations.  Pls. 56.1 Stmt. ¶ 5; Def. 56.1 Stmt. ¶ 14.  On September 21, 2001, the Texas Court entered a broad injunction that effectively prohibited the Tribe from engaging in any form of gaming activity.  Pls. 56.1 Stmt. ¶ 5; Def. 56.1 Stmt. ¶ 15; Pls. Ex. 8; Def. Ex. K.  In 2002, the Texas Court implemented a pre-approval process,

---

by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)-(d).

pursuant to which the Tribe would submit proposals regarding specific gaming activities and the Texas Court would determine prospectively whether those activities were permissible under the existing terms of the 2001 injunction or lawful modifications thereto. Pls. 56.1 Stmt. ¶ 5; Pls. Ex. 8; Def. 56.1 Stmt. ¶¶ 16-18; Def. Ex. K.

On July 19, 2013—prior to the closing of the sale pursuant to the June 10, 2013 SPA— Diamond Game received a letter from the Texas Attorney General that was addressed to the Tribe but copied to various vendors, including Diamond Game. Def. 56.1 Stmt. ¶ 19; Def. Ex. L. In the letter, the Texas Attorney General stated that he believed that the Tribe and various vendors, including Diamond Game, were engaged in the operation of "sweepstakes games" in "potential violation of the federal injunction." Def. 56.1 Stmt. ¶ 20; Def. Ex. L. The letter stated: "You do not have any Court permission to operate any sweepstakes games at these locations, nor have you submitted any 'firm proposals' to do so." Def. 56.1 Stmt. ¶ 20; Def. Ex. L. Breslo emailed Amaya on July 25, 2013 to inform it of the Texas Attorney General's letter. Def. 56.1 Stmt. ¶ 22; Def. Ex. M.

On September 24, 2013, the State of Texas filed a motion for contempt (the "Texas Contempt Motion") seeking monetary and injunctive relief against the Tribe and its vendors, including Diamond Game. Def. 56.1 Stmt. ¶ 23; Def. Ex. N. The motion, later amended on November 27, 2013, was premised on the contention that the Tribe's sweepstakes operations violated the injunction in the Texas Action. Def. 56.1 Stmt. ¶ 23; Pls. 56.1 Stmt. ¶ 6; Pls. Ex. 5. After Plaintiff Breslo and Amaya exchanged correspondence about the Texas Contempt Motion in late September and early October, Amaya sent a letter to Plaintiffs and their counsel on October 14, 2013, informing them of its position that Plaintiffs and Diamond Game had breached the SPA. Def. 56.1 Stmt. ¶¶ 24-28; Def. Exs. O-R. Amaya stated in the letter that Plaintiffs and

Diamond Game "intentionally concealed and failed to disclose in their respective Disclosure Schedules, among other things, the Texas [Action], [Diamond Game's] involvement with the Tribe in respect of the Texas [Action], negotiations among [Diamond Game] and the Texas Attorney General with respect to the Texas [Action], or the threat that [Diamond Game] could be made a party to the Texas [Action]." Def. 56.1 Stmt. ¶ 28; Def. Ex. R. Amaya further expressed concern that the Contempt Motion could lead regulators to take adverse action against Amaya following its purchase of Diamond Game. Def. 56.1 Stmt. ¶ 33. An agent of Diamond Game described Amaya in an October 25, 2013 email as having "made a decision that it is not willing to accept the perceived regulatory risk of [the Texas] business and therefore no longer wants it." *Id*.; Def. Ex. S.

## II. Creation of Blue Stone and First Amendment to the SPA

In response to Amaya's concerns, Diamond Game conferred with the Texas Attorney General's office to confirm that the State of Texas would dismiss Diamond Game from the Texas Action if it stopped directly leasing machines to the Tribe. Pls. 56.1 Stmt. ¶ 7; Pls. Ex. 11. On November 13, 2013, Breslo emailed Amaya to share that the "AG is willing to take [Diamond Game] out of the case if [Diamond Game] leases its games" to another vendor. Pls. 56.1 Stmt. ¶ 7; Pls. Ex. 11; Def. 56.1 Stmt. ¶ 37; Def. Ex. U. Plaintiffs and Amaya agreed that Diamond Game would lease the sweepstakes terminals then deployed with the Tribe to Blue Stone, an entity created and owned by Plaintiff Johnson, which in turn leased the machines to the Tribe. Pls. 56.1 Stmt. ¶ 7; Def. 56.1 Stmt. ¶¶ 37-38.

On or about January 16, 2014, Diamond Game and Blue Stone entered into an Equipment Lease Agreement (the "Texas Lease") under which Diamond Game leased the 416 sweepstakes terminals and other equipment then deployed with the Tribe to Blue Stone. Def. 56.1 Stmt. ¶ 38; Def. Ex. V. Under the Texas Lease, Blue Stone paid Diamond Game $13.11 per sweepstake

terminal per day.  Pls. 56.1 Stmt. ¶ 9; Def. 56.1 Stmt. ¶ 42.  On the same day, Blue Stone and the

Tribe entered into a Promotional Sweepstakes Agreement (the "Texas Lease Tribal Agreement"),

under which Blue Stone leased the 416 sweepstakes terminals and other equipment specified in

the Texas Lease to the Tribe in exchange for thirty percent of the revenue generated by the

terminals.  Def. 56.1 Stmt. ¶¶ 39, 41; Def. Ex. W.  The Texas Lease and the Texas Lease Tribal

Agreement together replaced Diamond Game's 2008 Lease with the Tribe, but the same 416

sweepstakes terminals and other equipment deployed with the Tribe under the 2008 Lease

remained in place.  Def 56.1 Stmt. ¶ 40.  On January 21, 2014, the Texas Attorney General

voluntarily dismissed Diamond Game from the Contempt Motion.  Pls. 56.1 Stmt. ¶ 8; Pls. Ex.

12; Def. 56.1 Stmt. ¶ 44; Def. Ex. X.

At the same time that Diamond Game was negotiating with the Texas Attorney General,

Plaintiffs and Amaya exchanged a series of emails concerning a potential amendment to the

SPA.  Def 56.1 Stmt. ¶¶ 52-58.  In particular, the parties negotiated the terms of a $7 million

holdback from the $25 million purchase price of Diamond Game.  In one November 20, 2013

email to Plaintiff Breslo, Amaya stated that "[t]he 7 million million [sic] dollar release is

contingent on resolving texas definitively."  Def. 56.1 Stmt. ¶ 54; Def. Ex. Z.

On February 13, 2014, the parties amended the SPA by executing the First Amendment

to Stock Purchase Agreement  (together with the SPA, the "Amended SPA").  Pls. 56.1 Stmt. ¶

4; Pls. Ex. 6; Def. 56.1 Stmt. ¶¶ 3, 62; Def. Ex. H.  The First Amendment to the SPA provided

that Amaya would hold back $7 million from the $25 million purchase price of Diamond Game

(the "Holdback Amount") until the "satisfaction or waiver" of four conditions—the "Texas

Clearance Event Conditions."  Pls. 56.1 Stmt. ¶ 10; Pls. Ex. 6 ("First Amendment to the SPA");

Def. 56.1 Stmt. ¶ 45; Def Ex. H (same). The First Amendment to the SPA defined the "Texas Clearance Event Conditions" as follows:

> "Texas Clearance Event Conditions" means the satisfaction or waiver, in [Amaya's] sole discretion, of each of the following:
>
> (i) a Texas Clearance Event shall have occurred . . . ;
>
> (ii) the Texas Lease shall have terminated and shall be of no further force or effect;
>
> (iii) [Diamond Game] shall have the right, free and clear of all Encumbrances . . . to possess the Texas Equipment; and
>
> (iv) the Texas Lease Tribal Agreement shall have been duly assigned to [Diamond Game] either (A) by [Blue Stone] or (B) automatically by operation of the Texas Lease Tribal Agreement in accordance with the terms thereof, together with any required consent by the YDSP Tribe, and [Blue Stone] shall thereafter have no rights or interest therein.

First Amendment to the SPA § 1.6. The First Amendment further defined a "Texas Clearance Event" to include:

> (i) the dismissal of the Texas Motion or Texas Action, which, in either case, shall not have been timely appealed or, if either the Texas Action or Texas Motion is dismissed without prejudice, the re-filing of either within the six (6)-month period immediately following such dismissal without prejudice;
>
> (ii) the final disposition of the Texas Motion or Texas Action by a court of competent jurisdiction, including any and all appeals, which permits continued operation of the Texas Equipment with or without commercially reasonable modifications to the Texas Equipment;
>
> (iii) any other legislative or regulatory event that permits the continued operation of the Texas Equipment with or without commercially reasonable modification to the Texas Equipment; or
>
> (iv) [Amaya], in its sole discretion, delivers written notice to [Roy Johnson] that a Texas Clearance Event has occurred; provided, that, in the case of each of the immediately preceding clauses (ii) and (iii), (A) [Amaya] may deduct from the Holdback Amount all of [Diamond Game's] and [Amaya's] actual costs for such commercially reasonable modifications and (B) after such commercially reasonable modifications, [Diamond Game] may operate the Texas Equipment using substantially the same hardware as [Blue Stone] immediately prior to such commercially reasonable modifications.

*Id.* The First Amendment also provided that "'Texas Equipment' means all of the Company's equipment and accessories leased to [Blue Stone] under the Texas Lease." *Id.*

The First Amendment also stated: "Notwithstanding anything to the contrary contained in . . . this Agreement, upon the occurrence of a Texas Event, and written notice from [Amaya] to [Roy Johnson] of such occurrence: (i) [James Breslo and Roy Johnson] shall immediately and automatically forfeit any right any of them may have to receive the Holdback Amount pursuant to this Agreement; (ii) the Purchase Price shall be deemed automatically reduced by the Holdback Amount; and (iii) [James Breslo and Roy Johnson] shall have no entitlement, claim to, or interest in the Holdback Amount pursuant to this Agreement or otherwise." *Id.* The First Amendment to the SPA defined a "Texas Event" to include:

> (i) the final disposition of the Texas Motion or Texas Action by a court of competent jurisdiction, including any and all appeals, pursuant to which the continued performance under the Texas Lease or otherwise in connection with [Diamond Game's] Business with or related to the YDSP Tribe is determined not to be permissible under applicable Law and there are no commercially reasonable modifications that can be made to the Texas Equipment that would make the operation of the Texas Equipment permissible under applicable law . . . or

> (iii) [Diamond Game's] continued performance under the Texas Lease or otherwise in connection with its Business with or related to the YDSP Tribe has become impermissible under applicable Law, whether due to a change in Law or applicable interpretation thereof by a Governmental Authority of competent jurisdiction, in either case occurring at any time after the date hereof and there are no commercially reasonable modifications that can be made to the Texas Equipment that permit the continued performance by [Diamond Game] under the Texas Lease following such change in Law or applicable interpretation thereof.

*Id.*

After the execution of the First Amendment, Amaya acquired Diamond Game, with Plaintiff Breslo staying on as president of Diamond Game until November 2016. Def. 56.1 Stmt. ¶ 64. Blue Stone, owned by Plaintiff Johnson, continued to lease the Texas Equipment to the Tribe. Def. 56.1 Stmt. ¶ 64. In May 2015, after Amaya spun off Diamond Game into a new

entity, Innova Gaming Group, Inc. ("Innova"), which conducted an initial public offering, Amaya owned approximately 40% of Innova's stock.  Def. 56.1 Stmt. ¶ 65.

In a May 22, 2015 email to the CEO of Diamond Game, Plaintiff Breslo wrote that a Texas Clearance Event "essentially means a final ruling, including appeals, on the legality of the machines."  Def. 56.1 Stmt. ¶ 63; Def. Ex. HH.

### III. Termination of the Texas Lease Tribal Agreement and Removal of the Terminals from the Tribe's Facilities

On October 9, 2015, the Tribe sent a letter to Blue Stone and Diamond Game terminating the Texas Tribal Lease Agreement.  Pls. 56.1 Stmt. ¶ 13; Pls. Ex. 17; Def. 56.1 Stmt. ¶¶ 68-69; Def. Ex. II.  On or about November 11, 2015, Blue Stone executed a new agreement with the Tribe.  Def. 56.1 Stmt. ¶¶ 70-73.  That month, the Tribe directed Diamond Game to remove 198 of the sweepstakes terminals from two of the Tribe's facilities, leaving only 218 sweepstakes terminals deployed with the tribe.  *Id*. ¶ 74.  When the older terminals were removed, Diamond Game President Bill Breslo—the brother of Plaintiff Jim Breslo—stated in an email, "I can't think of a market where we would use these machines.  So I suggest parting out."  *Id*.; Def. Ex. OO.  On December 31, 2015, the General Manager for the Tribe informed Diamond Game that he was "fed up with Jim [Breslo]" and that all remaining Diamond Game terminals would need to be removed on January 5, 2016.  Def. 56.1 Stmt. ¶ 75; Def. Ex. PP.  On January 5, 2016, Diamond Game sent Plaintiff Johnson a letter regarding the termination of the Texas Lease with Blue Stone.  Pl. 56.1 Stmt. ¶ 18; Pl. Ex. 26.  That day, the remaining 218 Diamond Game terminals were removed from the Tribe's facilities.  Pls. 56.1 Stmt. ¶ 13; Def. 56.1 Stmt. ¶ 76.

### IV. Texas Federal Court Order

On May 27, 2016, the Texas Court entered an order (the "Texas Order") on the Texas Contempt Motion in which it held the Tribe in contempt for violating the 2001 injunction due to

the Tribe's operation of the sweepstakes terminals.  Pls. 56.1 Stmt. ¶ 14; Pls. Ex. 8 ("Texas Order"); Def. 56.1 Stmt. ¶¶ 94-95; Def. Ex. K (same).  The Texas Order required the Tribe to terminate its sweepstakes gaming operations within sixty days and provided that failure to do so would result in a civil penalty of $100,000 per day.  Pls. 56.1 Stmt. ¶ 14; Def. 56.1 Stmt. ¶ 97; Texas Order at 54.  The Texas Order also eliminated the requirement that the Tribe obtain pre-approval from the Texas Court before modifying its gaming activities.  Pls. 56.1 Stmt. ¶ 14; Def. 56.1 Stmt. ¶ 102; Texas Order at 53.  As the Texas Court held, "Requiring the [Tribe] to seek this pre-approval from the Court to engage in any gaming activities violates the spirit, if not the letter, of the Restoration Act, and has improperly contorted this Court's role of arbiter into that of a regulatory body. The Court should not, and will not, undertake this role any longer." Pls. 56.1 Stmt. ¶ 14; Texas Order at 2.  The Texas Order also stated that "the legality of the Tribe's purported bingo operations is not before this Court.  And, because the Court will no longer require the [Tribe] to submit proposals regarding their gaming activities, the Court does not opine on whether any proposed bingo activities are permissible under the Restoration Act."  Def. 56.1 Stmt. ¶ 101; Texas Order at 42.  The Tribe did not appeal the Texas Order holding it in contempt.  Pls. 56.1 Stmt. ¶ 15.  At the time the Texas Order was entered, Plaintiffs did not claim that it constituted a Texas Clearance Event, Def. 56.1 Stmt. ¶¶ 105, 116, and Defendant did not claim that it constituted a "Texas Event," Pl. 56.1 Stmt. ¶ 20.

**V.    Negotiations Regarding Redeploying the GEM Terminals**

After the termination of the Texas Tribal Lease Agreement and the removal of all the Texas Equipment from the Tribe's facilities, Diamond Game engaged in negotiations with the Tribe to redeploy the newer, two-monitor terminals known as GEM cabinet terminals.  Pls. 56.1 Stmt. ¶ 17; Def. 56.1 Stmt. ¶¶ 80-82.  Diamond Game proposed leasing 200 two-monitor GEM cabinet terminals to the Tribe, 120 of which had previously been deployed with the Tribe under

the Texas Lease Tribal Agreement, and 80 of which would come from Diamond Game's other inventory. Def. 56.1 Stmt. ¶ 84; Def. Ex. J. Diamond Game spent $262,000 on refurbishing the two-monitor GEM cabinet terminals in anticipation of redeploying them with the Tribe for possible use as bingo terminals. Pls. 56.1 Stmt. ¶ 17; Def. 56.1 Stmt. ¶¶ 89, 91-92. The Tribe insisted that under a new equipment lease, the Tribe would receive 80 percent of the revenue from the terminals and Diamond Game would receive 20 percent, a split that Breslo determined was "not economically feasible" for Diamond Game. Def. 56.1 Stmt. ¶¶ 86-87. Accordingly, the negotiations did not result in the execution of a new lease, and no Diamond Game terminals have been operated by the Tribe since January 5, 2016, whether for sweepstakes gaming or for any other purpose. *Id*. ¶¶ 79, 81, 88. The two-monitor GEM cabinets were never deployed with the Tribe, and the 297 single-monitor terminals were all scrapped for spare parts or used in other markets in limited numbers. *Id*. ¶ 90.

Defendant claims that the Tribe told Diamond Game it was not interested in leasing any of the older, single-monitor terminals that had comprised the majority of the Texas Equipment. *Id*. ¶ 83; Def. Ex. A ("Kerns Dep.") at 118:13-119:7, 127:8-20. The single-monitor terminals were therefore not a part of the parties' failed negotiations about modifying and redeploying the two-monitor GEM cabinet terminals. Def. 56.1 Stmt. ¶ 92; Kerns Dep. at 178:3-12. The parties dispute whether the older, single-monitor terminals could have been converted to bingo. *Compare* Pls. 56.1 Stmt. ¶ 16, *and* Pls. Counterstatement ¶ 93, *with* Def. 56.1 Stmt. ¶ 93, *and* Def. Counterstatement ¶ 16. According to Bill Breslo, "All of the 416 machines originally leased to Blue Stone (and in turn, the Tribe) were capable of modifications to offer different gaming experiences besides sweepstakes, including, at a minimum electronic bingo. This includes the single-monitor cabinets. Such modifications would have entailed software changes

10

and relatively minor hardware changes to the machines." Pls. Response Ex. 8, ¶ 2. Yet Randee Kerns, Diamond Game's Director of Business Development and Compliance who was responsible for the company's relationship with the Tribe, testified at his deposition that "you would have to have two monitors" for a terminal to be used for bingo because of the way the information is displayed to players on the screen. Kerns Dep. at 172:8-19. Kerns also stated that converting two-monitor terminals from sweepstakes to bingo required changing the software and modifying the hardware "to have different inserts for the buttons on the button panel." *Id*. at 171:21-172:7.

## VI. Assignment of the Texas Tribal Lease Agreement and Plaintiffs' Demand Letter

On or about June 2, 2017, Blue Stone, Diamond Game and the Tribe executed an Assignment, Assumption, Release and Consent Agreement (the "Assignment"). Def 56.1 Stmt. ¶ 106; Def. Ex. VV. The Assignment was executed more than nineteen months after the Tribe's termination of the Texas Tribal Lease Agreement on October 9, 2015 and more than sixteen months after the Texas Equipment was removed from the Tribe's facilities on January 5, 2016. *See supra* Section III; Def. 56.1 Stmt. ¶ 107. The Assignment recites that in a letter "dated October 9, 2015, the [Tribe] notified the Assignor [Blue Stone] of its intention to terminate, or not to renew, the Texas Lease Tribal Agreement." Def. 56.1 Stmt. ¶ 107; Def. Ex. VV. On May 22, 2017, an attorney for Roy Johnson wrote in an email to an attorney for Diamond Game, "Because the contract has been terminated by the [Tribe], the assignment has no economic benefit to Amaya, except as a barrier to the holdback funds. Leaving the other conditions in place protects Amaya's holdback in the case of a Texas Event." Def. 56.1 Stmt. ¶ 108; Def. Ex. WW. Additionally, Plaintiff Johnson, as Managing Member of Blue Stone, specifically agreed in a separate settlement agreement with Diamond Game: "**No Texas Event or Texas Clearance Event**. For the avoidance of doubt, neither this [Settlement] Agreement nor the Texas Lease

Tribal Agreement Assignment constitutes a Texas Event or a Texas Clearance Event." Def. 56.1 Stmt. ¶ 114; Def. Ex. YY.

On June 13, 2017, Plaintiffs first demanded that Amaya pay the Holdback Amount. Def. 56.1 Stmt. ¶ 117; Def. Ex. CCC. Plaintiffs asserted that the May 27, 2016 Texas Court Order consisted a Texas Clearance Event, and that the other three Texas Clearance Event Conditions were satisfied. Def. Ex. CCC. They claimed, "Shortly after the Order, reasonable modifications were made to the disputed games played by the [T]ribe (including the Texas Equipment) and the [T]ribe continued to operate them, and continues to operate the modified games more than a year after its May 27, 2016 Order." *Id.*

## VII. Texas Court and Fifth Circuit Decision on Bingo

On June 7, 2017, the State of Texas commenced a new action against the Tribe in the United States District Court for the Western District of Texas, *State of Texas v. Ysleta Del Sur Pueblo, et al.,* No. 3:17-CV-00179-PRM (W.D. Tex.), in which it alleged that the Tribe's bingo operations subsequent to the May 27, 2016 Order were illegal under Texas Law. Def. 56.1 Stmt. ¶ 121; Def. Ex. GGG. On February 14, 2019, the Texas Court held that the Tribe's bingo operations were unlawful and permanently enjoined those operations. Def. 56.1 Stmt. ¶ 122; Def. Ex. HHH. On March 21, 2019, Defendant wrote Plaintiffs a letter claiming that the "February 14, 2019 Order constitutes a Texas Event, to the extent that a Texas Event has not occurred previously." Pls. 56.1 Stmt. ¶ 20; Pls. Ex. 28.

On April 2, 2020, the United States Court of Appeals for the Fifth Circuit affirmed the Texas Court's decision permanently enjoining the Tribe's bingo operations. *State v. Ysleta Del Sur Pueblo*, No. 19-50400, 2020 WL 1638408, at *5 (5th Cir. Apr. 2, 2020), as revised (Apr. 3, 2020).

12

## PROCEDURAL HISTORY

Plaintiffs commenced this action on September 28, 2017, alleging a single claim for breach of contract. Dkt. 1. Defendant moved to dismiss the Complaint on October 31, 2017. Dkt. 12. The Court denied Defendant's motion in an oral ruling on May 25, 2018. Dkt. 27.

Following the close of discovery, Plaintiffs and Defendant filed cross-motions for summary judgment. Dkts. 54-62. The parties opposed each other's motions on August 22, 2019, Dkts. 67-72, and filed replies in support of their motions on September 16, 2019, Dkts. 73-75. On October 2, 2019, the parties informed the Court that they had scheduled mediation, and requested that the Court hold their motions for summary judgment in abeyance. Dkt. 76. After the parties notified the Court that mediation was not successful, Dkt. 78, the Court held oral argument on January 22, 2020.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted). "When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). On a motion for summary judgment, the Court must "construe the facts in the light most favorable to

the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

Courts in the Second Circuit must "interpret [a] contract to give effect to the intent of the parties as expressed in the clear language of the contract . . . . Words and phrases in a contract are to be given their plain meaning and the contract is to be construed to give full meaning and effect to all of its provisions." *Am. Commercial Lines LLC v. Water Quality Ins. Syndicate*, 679 F. App'x 11, 14 (2d Cir. 2017) (internal quotation marks and citations omitted). If the court "determines that a provision in the insurance contract is ambiguous, it may consider extrinsic evidence to discern the parties' intent at the formation of the contract. A provision is ambiguous if it could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (internal quotation marks and citations omitted). "[S]ummary judgment based upon construction of a contract is appropriate only if the meaning of the language is clear, considering all the surrounding circumstances and undisputed evidence of intent, and there is no genuine issue as to the inferences that might reasonably be drawn from the language." *Sharkey v. Ultramar Energy Ltd.*, 70 F.3d 226, 230 (2d Cir. 1995).

## DISCUSSION

The core question in this case is whether Amaya breached the Amended SPA by failing to pay Plaintiffs the $7 million Holdback Amount. As previously discussed, the Amended SPA only required Amaya to pay the Holdback Amount upon the "satisfaction or waiver, in [Amaya's] sole discretion," of the four "Texas Clearance Event Conditions," meaning:

(i) a Texas Clearance Event shall have occurred . . . ;

(ii) the Texas Lease shall have terminated and shall be of no further force or effect;

14

(iii) [Diamond Game] shall have the right, free and clear of all Encumbrances . . . to possess the Texas Equipment; and

(iv) the Texas Lease Tribal Agreement shall have been duly assigned to [Diamond Game] either (A) by [Blue Stone] or (B) automatically by operation of the Texas Lease Tribal Agreement in accordance with the terms thereof, together with any required consent by the YDSP Tribe, and [Blue Stone] shall thereafter have no rights or interest therein.

Pls. 56.1 Stmt. ¶¶ 10-11; Def. 56.1 Stmt. ¶¶ 45-46; First Amendment to the SPA.

The parties do not dispute that the second and third conditions for payment of the Holdback Amount were satisfied on January 5, 2016, when Diamond Game terminated the Texas Lease with Blue Stone and the remaining Texas Equipment was removed from the Tribe's facilities and returned to Diamond Game. Pl. 56.1 Stmt. ¶¶ 13, 18; Pl. Ex. 26.

The parties are in disagreement, however, over whether the first condition for payment of the $7 million Holdback Amount—a "Texas Clearance Event"—was satisfied. The First Amendment to the SPA defines a "Texas Clearance Event" to include "the final disposition of the Texas Motion or Texas Action by a court of competent jurisdiction, including any and all appeals, which permits continued operation of the Texas Equipment with or without commercially reasonable modifications to the Texas Equipment." First Amendment to the SPA ¶ 1.6. Plaintiffs argue that the Texas Court's May 27, 2016 Order (the "Texas Order") constitutes a Texas Clearance Event under the Amended SPA because it contemplated that the Tribe would make modifications to its gaming terminals and ended the pre-approval requirement for any such modifications. Defendant, by contrast, argues that the Texas Order was not a Texas Clearance Event under the Amended SPA for three independent reasons. Defendant first contends that the Texas Order did not, in fact, "permit" continued operation of the Texas Equipment because the Texas Court found the Tribe's existing sweepstakes unlawful and declined to opine on whether a switch to bingo was permissible. Defendant next argues that no

Texas Clearance Event occurred because the "continued operation of the Texas Equipment" was impossible in light of the fact that months prior to the May 27, 2016 Texas Order, the Tribe terminated the Texas Lease Tribal Agreement and ordered the removal of the Texas Equipment from the Tribe's gaming facilities. Pls. 56.1 Stmt. ¶ 13; Pls. Ex. 17; Def. 56.1 Stmt. ¶¶ 68-76; Def. Ex. II. Defendant also contends that no Texas Clearance Event occurred because the majority of the Texas Equipment could not have been converted to bingo. Finally, the parties dispute whether the fourth condition for payment of the Holdback Amount—the assignment of the Texas Lease Tribal Agreement to Diamond Game—was satisfied.

For the reasons that follow, the Court finds that no Texas Clearance Event has occurred because the Texas Court did not "permit" the continued operation of the Texas Equipment, and therefore Defendant was not contractually obligated to pay Plaintiffs the $7 million Holdback Amount. The Court therefore declines to reach the questions of whether the "continued operation" of the Texas Equipment would have been possible, or whether the assignment of the Texas Lease Tribal Agreement was valid. Accordingly, the Court grants Defendant's motion for summary judgment and denies Plaintiffs' motion.

I. **No Texas Clearance Event Occurred Because the Texas Court Did Not "Permit" the Continued Operation of the Texas Equipment**

Defendant argues that pursuant to the plain meaning of the Amended SPA, as informed by the context in which it was executed, no Texas Clearance Event occurred because the Texas Order did not "permit[] continued operation" of the Texas Equipment. Def. MSJ at 4. Specifically, Defendant contends that the parties drafted the First Amendment to the SPA, including the word "permits," with the reasonable expectation that Amaya would pay the Holdback Amount only if the final resolution of the Texas Action affirmatively allowed the continued operation of the Texas Equipment. *Id*. Defendant points to the fact that at the time the

First Amendment to the SPA was negotiated, the parties understood that the Texas Court would rule on the legality of the existing sweepstakes games and had in place a longstanding pre-approval process pursuant to which it would affirmatively determine whether or not the Tribe's gaming proposals were lawful. *Id*. Defendant argues, therefore, that the parties reasonably anticipated that the Texas Action would prospectively resolve the legality of any of the Tribe's proposed uses of the Texas Equipment. *Id*. Plaintiffs, by contrast, argue that the Amended SPA does not require "express" permission, but rather "merely requires that the effect of the order is to permit operation." Pls. MSJ at 4. The Court agrees with Defendant that the plain meaning of the word "permit," in the context of the Amended SPA, means more than "not prohibit," and that the May 27, 2016 Order did not "permit" the continued operation of the Texas Equipment.

As previously discussed, on May 27, 2016, the Texas Court held that the Tribe's operation of sweepstakes machines violated the 2001 injunction and therefore ordered the Tribe to terminate its sweepstakes operations within sixty days. Pls. 56.1 Stmt. ¶ 14; Def. 56.1 Stmt. ¶¶ 94-97; Texas Order at 54. The Texas Court also eliminated the requirement that the Tribe obtain pre-approval from the Texas Court before modifying its gaming activities. Pls. 56.1 Stmt. ¶ 14; Def. 56.1 Stmt. ¶ 102; Texas Order at 53. With respect to other possible uses of the Texas Equipment, the Texas Court stated that "the legality of the Tribe's purported bingo operations is not before this Court. And, because the Court will no longer require the [Tribe] to submit proposals regarding their gaming activities, the Court does not opine on whether any proposed bingo activities are permissible under the Restoration Act." Def. 56.1 Stmt. ¶ 101; Texas Order at 42. The Tribe did not appeal the Texas Court's decision. Pls. 56.1 Stmt. ¶ 15. After the State of Texas commenced a new action on June 7, 2017 alleging that the Tribe's bingo operations violated Texas Law, Def. 56.1 Stmt. ¶ 121; Def. Ex. GGG, the Texas Court found the Tribe's

bingo operations unlawful and permanently enjoined them on February 14, 2019, Def. 56.1 Stmt. ¶ 122; Def. Ex. HHH. On April 2, 2020, the Fifth Circuit affirmed the Texas Court's decision. *Ysleta Del Sur Pueblo*, 2020 WL 1638408, at *5.

The Texas Court plainly did not "permit" the continued operation of the Texas Equipment in its May 27, 2016 decision, as it found the sweepstakes operations unlawful and expressly chose not to "opine" on the "permissib[ility]" of bingo. Texas Order at 42. This interpretation is supported by the plain meaning of the word "permit," which is to find something "permissible." *See Am. Commercial Lines LLC*, 679 F. App'x at 14 (2d Cir. 2017) ("Words and phrases in a contract are to be given their plain meaning."). This conclusion is further reinforced, as Defendant points out, by the fact that the parties understood at the time they executed the First Amendment to the SPA that any new gaming proposals were subject to the Texas Court's longstanding preapproval process—and that the Texas Court would therefore affirmatively permit or prohibit the Tribe from engaging in any proposed gaming operation. The Court thus disagrees with Plaintiffs' contention that the parties intended the word "permits" to mean either express or implied permission, as there was no mechanism in place for the Texas Court to grant implied permission to a gaming proposal at the time the parties executed the First Amendment to the SPA.

The parole evidence confirms that there is no material dispute of fact regarding the meaning of the word "permits" in the Amended SPA. That meaning is clear when considering evidence regarding Amaya's intent in negotiating the terms of the First Amendment to the SPA, which was to reduce its exposure to the risk posed by the Texas Attorney General's claim that the Tribe's gaming activities were unlawful. *See Am. Commercial Lines LLC*, 679 F. App'x at 14 (2d Cir. 2017). This driving purpose is reflected in Amaya's November 20, 2013 email to

Plaintiff Breslo stating that "[t]he 7 million . . . dollar release is contingent on resolving [T]exas *definitively*." Def. Ex. Z (emphasis added). The Texas Court's May 27, 2016 decision was far from the "definitive" resolution Amaya sought to protect against the risk that the Tribe could no longer operate the Texas Equipment. Instead, it left unresolved the legality of any proposal to convert the Texas Equipment for bingo. Indeed, Plaintiffs' own communications reflect their understanding that Amaya sought a definitive resolution of the Texas Action. For example, on December 10, 2013, outside counsel for Plaintiffs stated, in commenting on a draft of the First Amendment, that "[i]f the federal district court rules that the machines can continue in operation then the regulatory risk is *resolved* and Amaya will be *assured* of ongoing Texas revenue." Def. 56.1 Stmt. ¶ 59; Def. Ex. DD (emphasis added). Moreover, in a May 22, 2015 email to the CEO of Diamond Game, Plaintiff Breslo wrote that a Texas Clearance Event "essentially means a final ruling, including appeals, on the legality of the machines." Def. 56.1 Stmt.; Def. Ex. HH. These statements suggest that Plaintiffs also understood that no Texas Clearance Event could occur in the absence of a final resolution in the Texas Action. A resolution finding the sweepstakes operations unlawful and expressly declining to opine on the legality of bingo clearly does not constitute "a final ruling . . . on the legality of the machines."

Accordingly, the Court holds that no Texas Clearance Event occurred, as the Texas Court did not "permit[] continued operation" of the Texas Equipment in its May 27, 2016 decision, and never "permitted" such continued operation thereafter. In fact, after the State of Texas brought a second action against the Tribe, the Texas Court held that the Tribe's bingo operations were unlawful and permanently enjoined those operations on February 14, 2019. Def. 56.1 Stmt. ¶ 122; Def. Ex. HHH (*Texas v. Ysleta del Sur Pueblo*, No. EP-17-CV-179-PRM, 2019 WL 639971 (W.D. Tex. Feb. 14, 2019)). That decision was affirmed by the Fifth Circuit. *Ysleta Del Sur*

*Pueblo*, 2020 WL 1638408, at *5. Because no Texas Clearance Event occurred, Amaya did not violate the Amended SPA by refusing to pay Plaintiffs the $7 million Holdback Amount.

The Court therefore need not reach Amaya's argument that a Texas Clearance Event also did not occur because the "continued operation of the Texas Equipment" was impossible given that (1) the Texas Equipment was removed from the Tribe's gaming facilities months prior to May 27, 2016 Texas Order, and (2) the older, single-monitor terminals—which comprised the majority of the Texas Equipment—could not have been converted to bingo. No Texas Clearance Event would have occurred even if all 416 terminals remained at the Tribe's facilities at the time of the Texas Order, and even if it would have been possible to convert the older terminals to bingo, because the Texas Court plainly did not "permit" the continued operation of the Texas Equipment as bingo terminals.

## II. The Court Declines to Reach the Question of Whether the Assignment of the Texas Lease Was Valid

Finally, Defendant argues that fourth condition for payment of the Holdback Amount— the assignment of the Texas Lease Tribal Agreement to Diamond Game—was not satisfied. Defendant contends that the parties had a reasonable expectation that this condition required the assignment of an actual ongoing business, not a terminated lease. Def. MSJ at 6. The assignment occurred on June 2, 2017, more than nineteen months after the Tribe's termination of the Texas Tribal Lease Agreement and more than sixteen months after the removal of the last of the Texas Equipment from the Tribe's facilities. *Id.*; Def. 56.1 Stmt. ¶ 107.

Even assuming the assignment of the Texas Lease was valid, Amaya would still not have breached the Amended SPA by refusing to pay the Holdback Amount because no Texas Clearance Event occurred and the Amended SPA conditions the payment of the Holdback Amount on the "satisfaction or waiver" of "each" of the four Texas Clearance Event Conditions.

First Amendment to the SPA § 1.6.  The Court therefore declines to reach the question of whether the assignment of the Texas Lease was valid.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 54, 58, and 59 and enter judgment in favor of Defendant.

SO ORDERED.

Dated:     April 7, 2020
           New York, New York

_____
Ronnie Abrams
United States District Judge